**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**DAVID LEE HOLMES, SR.,**

      **Plaintiff,**

**vs.**                         **Case No.  4:13-CV-69-RH/CAS**

**CAROLYN W. COLVIN,
Acting Commissioner of the Social
Security Administration,**

      **Defendant.**

_____/


## CORRECTED REPORT AND RECOMMENDATION[1]

      This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Commissioner of the Social Security Administration (SSA) denying Plaintiff's application for a period of disability and Disability Insurance Benefits (DIB).  After careful consideration of the entire Record, it is respectfully recommended that the decision of the Commissioner be reversed and remanded.

## I.  Procedural History

      On July 18, 2007, Plaintiff, David Lee Holmes, Sr., filed a Title II application for a period of disability and DIB beginning January 1, 2006, as amended during the supplemental hearing, due to rheumatoid arthritis.  R. 5-6, 15, 65-66, 96-100, 180-86.

---

[1]  This Corrected Report and Recommendation makes uniform throughout the term "substantial gainful activity" (SGA).

(Citations to the Record shall be by the symbol "R." followed by a page number that appears in the lower right corner.)  Plaintiff's date last insured, or the date by which his disability must have commenced in order to receive DIB under Title II is June 30, 2008. R. 5, 193.

Plaintiff's application was denied initially on October 24, 2007, and upon reconsideration on March 28, 2008.  R. 15, 96-100, 109-11.  On April 18, 2008, Plaintiff requested a hearing.  R. 15.  Plaintiff appeared and testified in two hearings in Tallahassee, Florida, before Administrative Law Judge (ALJ) John D. Thompson, Jr., on April 9 and July 14, 2009.  R. 15, 25-95.  Plaintiff was represented by attorney Lorin J. Lee during the hearings.  R. 15, 143.  Paul R. Dolan, an impartial vocational expert, testified during the July hearing.  R. 15, 27, 62, 93-94, 137-41, 161.  Internist and rheumatologist Robert S. Karsh, M.D., provided testimony at the ALJ's request at the July hearing.  R. 15, 22, 62-76, 144, 163.

On September 2, 2009, the ALJ issued his decision denying Plaintiff's application for benefits.  R. 15-23.  The Appeals Council (AC) granted Plaintiff's request for review and on July 9, 2010, affirmed the ALJ's decision, but clarified that Plaintiff's alleged onset date was amended to January 1, 2006, and that Plaintiff continued to meet the insured status requirement of the Social Security Act for DIB until June 30, 2008.  R. 1-7, 10, 173-75.  The ALJ correctly reported that Plaintiff's counsel amended the alleged onset date from October 1, 2004, to January 1, 2006, R. 15, 65-66, but incorrectly noted in his findings that the alleged onset date was October 1, 2004, as alleged in the DIB application.  R. 17.  The ALJ incorrectly found that Plaintiff's last date insured for DIB

was August 31, 2008, rather than June 30, 2008.  R. 5, 15.  The Appeals Council

corrected both findings.  R. 5.

On February 15, 2013, Plaintiff filed a Complaint for judicial review with the

United States District Court seeking review of the Commissioner's final decision.

Doc. 1.[2]  The parties filed memoranda of law, docs. 11 and 12, which have been

considered.

## II.  Findings of the ALJ and Appeals Council

The ALJ made several findings relative to the issues raised in this appeal.  R. 15-

23.  The Appeals Council also made several findings that are recited below.  Also

included are findings by the ALJ that were not addressed by the Appeals Council.

1. "The claimant met the special earnings requirements of the Act on January 1,
   2006, the date the claimant stated he became unable to work and met them
   through June 30, 2008.  The claimant has not engaged in substantial gainful
   activity since January 1, 2006" the amended alleged onset date.  R. 5 (AC).
   "The claimant worked after the alleged disability onset date but this work
   activity did not rise to the level of substantial gainful activity."  R. 17 (ALJ).[3]

2. "The claimant has the following severe impairment: degenerative disc disease
   from L4-S-1, arthritis of the right shoulder and hands, and hypertension,
   controlled with medication, but does not have an impairment or combination
   of impairments which is listed in, or which is medically equal to an impairment
   listed in 20 CFR Part 404, Subpart P, Appendix 1."  R. 5 (AC); *See* R. 17
   (ALJ) (same).

---

[2]  In the Complaint, Plaintiff alleges in paragraph 6 that the Appeals Council
denied Plaintiff's request for review on or about July 9, 2010.  Doc.1 at 2.  In paragraph
7, Plaintiff alleges: "Plaintiff's complaint can be filed up to and including February 18,
2013, according to a notice issued by the Appeals Council, dated January 14, 2013,
which allowed 35 days from that date to file a civil action."  *Id.*  This Notice does not
appear in the record.  The Commissioner filed an Answer and admitted the allegations
in paragraphs 6 and 7.  Doc. 8 at 1.  Therefore, it appears the Complaint was timely
filed.

[3]  Plaintiff was 63 years old as of his alleged amended onset date (66 at the time
of the hearing) with a ninth grade education and a work history as a plasterer.  R. 28-30,
77-78.

3. "The claimant's impairment results in the following limitations on his ability to perform work-related activities: lift and carry 25 pounds frequently and 50 pounds occasionally; stand or walk six hours out of an eight-hour workday; sit two hours of an eight-hour workday.  In view of the above limitations, the claimant has the residual functional capacity [RFC] to perform the full range of the medium exertional level."  R.5; *see* R. 20 (ALJ) (same).

4. "The claimant's subjective complaints are not fully credible for the reasons identified in the body of this decision."  R. 5; *see* R. 22 (ALJ) (similar)

5. "The limitations on the claimant's ability to perform work-related activities as set forth in Finding 3 do not preclude the performance of past relevant work as construction supervisor, plastering.  Therefore, the claimant's impairment does not preclude the performance of past relevant work (20 CFR 404.1520(e))."  R. 6 (AC); *see* R. 23 (ALJ) (same).  The ALJ also stated in part: "Finally, the claimant testified at the first hearing that he did no more than light work based on the lift, carry, stand and walk requirements of a plastering supervisor.  In comparing the claimant's [RFC] with the physical and mental demands of this past relevant work, the undersigned finds that the claimant was able to perform it as *actually performed* by this claimant based on his earlier testimony."  R. 23 (emphasis added).

6. "The claimant is not disabled as defined in the Social Security Act at any [sic] September 2, 2009," the date of the ALJ's decision.  R.6 (AC), 23 (ALJ).

## III.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).  The court may not reweigh the

evidence or substitute its own judgment for that of the ALJ even if it finds that the
evidence preponderates against the ALJ's decision.  Moore, 405 F.3d at 1211.[4]

"In making an initial determination of disability, the examiner must consider four
factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining
physicians; (3) subjective evidence of pain and disability as testified to by the claimant
and corroborated by [other observers, including family members], and (4) the claimant's
age, education, and work history.'"  Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the
claimant is not only unable to do past relevant work, "but cannot, considering his age,
education, and work experience, engage in any other kind of substantial gainful work
which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an
"inability to engage in any substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous period of not less than 12
months."  42 U.S.C. § 423(d)(1)(A); see 20 C.F.R. § 404.1509 (duration requirement).
Both the "impairment" and the "inability" must be expected to last not less than 12

---

[4]  "If the Commissioner's decision is supported by substantial evidence we must
affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232,
1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard,
however, does not permit a court to uphold the Secretary's decision by referring only to
those parts of the record which support the ALJ.  A reviewing court must view the entire
record and take account of evidence in the record which detracts from the evidence
relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).
"Unless the Secretary has analyzed all evidence and has sufficiently explained the
weight he has given to obviously probative exhibits, to say that his decision is supported
by substantial evidence approaches an abdication of the court's 'duty to scrutinize the
record as a whole to determine whether the conclusions reached are rational.'"  Cowart
v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

months.  Barnhart v. Walton, 535 U.S. 212 (2002).  In addition, an individual is entitled

to DIB if he is under a disability prior to the expiration of his insured status.  *See*

42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of

Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y

of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-

(v).

> 1.      Is the individual currently engaged in substantial gainful activity?
>
> 2.      Does the individual have any severe impairments?
>
> 3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?
>
> 4.      Does the individual have any impairments which prevent past relevant work?
>
> 5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  Consideration

is given to the assessment of the claimant's RFC and the claimant's past relevant work.

If the claimant can still do past relevant work, there will be a finding that the claimant is

not disabled.  If the claimant carries this burden, however, the burden shifts to the

Commissioner at step five to establish that despite the claimant's impairments, the

claimant is able to perform other work in the national economy in light of the claimant's

RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel,

190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.  Legal Analysis

### A.  Issues Presented

Plaintiff argues that the ALJ's findings at step one and step four are in the conflict and that Plaintiff cannot return to a job that is not, by regulatory definition, past relevant work.  Doc. 11 at 9-10.  Plaintiff argues that the ALJ erred in determining that Plaintiff can perform the full range of medium exertional activity because it is based on an erroneous conclusion that Plaintiff was not properly diagnosed with rheumatoid arthritis by his treating rheumatologist, Dr. Cannella; that it is not clear what weight the ALJ accorded the respective physicians and the reasons for his decision; and that the ALJ's RFC determination is not supported by substantial evidence.  Doc. 11 at 10-17.  Plaintiff also argues that the ALJ's credibility determination of Plaintiff is not supported by substantial evidence.  Doc. 11 at 17-20.

This case should be reversed and remanded because the ALJ erred at step four when he determined Plaintiff could perform past relevant work that he also determined, at step one, was not SGA contrary to 20 C.F.R. § 404.1560(b)(1).  As a result, it is unnecessary to discuss the other issues raised by Plaintiff.

### B.  Medical Evidence

On November 3, 2004, Plaintiff established medical care with treating physician,
Thomas G. Serio, M.D.  R. 300.  Plaintiff's past history included "significant for back
pain, hypercholesterolemia, and history of tobacco use with recurrent sinusitis and
bronchitis.  Also has a history of carpal tunnel syndrome and neck spondylosis with
history of stress ulcer and hypertension.  He is currently not on any medications."  *Id.*  At
this initial visit, Plaintiff was in no apparent distress, although tenderness and synovitis
in his joints and fingers and edema were noted.  *Id.*  On December 9, 2004, Dr. Serio
noted "suspect possibly osteoarthritis."  R. 299.  Bextra was prescribed and Plaintiff was
referred to rheumatologist Amy C. Cannella, M.D.  *Id.*

On December 13, 2004, Plaintiff first saw Dr. Cannella, and described having
difficulty using a trowel at work due to hand pain.  His pain was worse in the morning
and he had to manually straighten out the fingers of each hand after they were in a
static position.  He also reported low back pain and stiffness.  Tylenol did not help;
Bextra helped somewhat.  R. 329-30.  Upon examination, Dr. Cannella noted slight
ulnar deviation, enlargement of the metacarpals with some trace synovitis; synovitis on
the third, fourth, and fifth proximal interphalangeal joints bilaterally; swelling in the distal
phalangeal joints (some Heberden's nodules); right shoulder pain with internal rotation,
and the inability to make a claw or fist.  His wrists, elbows, and shoulders were without
any synovitis.  R. 330.  She also reviewed the laboratory testing indicating a negative
rheumatoid factor and sedimentation rate (ANA), but a positive Creactive/inflammation
(CRP) test, and November 2004 hand x-rays.  Dr. Cannella noted that she disagreed

with the radiologist's reading of the x-rays as normal, R. 336,[5] when she saw

osteoarthritis of the distal interphalangeal joints and erosions at the left third and fourth

proximal phalanx, but would discuss it with the radiologist. Further testing was ordered

and Dr. Cannella continued Plaintiff's prescription for Bextra. R. 331. A pelvic x-ray

indicated mild facet degeneration from L4 through S1. R. 335. His extremities had no

cyanosis, clubbing, or edema; his strength was 5/5 and symmetric. R. 330; *see* R. 18.

On December 30, 2004, Plaintiff saw Dr. Cannella for ongoing joint pain and joint

swelling in the hands with fatigue. R. 326. Bextra was helping, but he was still unable

to make a claw or fist. Dr. Cannella also noted slight ulnar deviation, enlargement of the

metacarpal joints with some trace synovitis, and synovitis on the third, fourth, and fifth

proximal interphalangeal joints; some Heberden's nodules, and shoulder pain with

movement. Dr. Cannella's assessment was seronegative inflammatory polyarthritis vs.

normal ESR PMR. A trial of prednisone was prescribed for diagnostic purposes with

continuing Bextra. *Id.*

On March 2, 2005, Plaintiff saw Dr. Cannella during a follow-up visit complaining

of continuing hand pain. Although Plaintiff reported feeling a little better with decreased

stiffness, he was not markedly better and his hands were still swollen. R. 323.

Dr. Cannella noted slight ulnar deviation, enlargement of the metacarpal joints with

trace synovitis; synovitis on the right third and fourth proximal interphalangeal joints;

some Heberden's nodules; and pain with right shoulder movement with internal rotation.

His lower extremities, i.e., hip, knees, ankles, PIP's, DIP's had no synovitis, warmth, or

erythema, and he had full range of motion. R. 324. His strength remained at 5/5 and

---

[5]   The findings of radiologist, Maribel U. Lockwood, M.D., were: "No bony or
articular abnormality is seem in either hand. Soft tissues are normal." R. 336 (Exhibit
3F at 50); *see* R.17.

symmetric; DTR's at +2-4 throughout; and no gross sensory deficits.  He had no cyanosis, clubbing, or edema of his extremities.  *Id.*  Plaintiff was unable to make a claw or a fist.  Dr. Cannella again noted that she disagreed with the radiologist's interpretation of the hand x-rays as normal, R. 336.  R. 324.  She found that Plaintiff had osteoarthritis of the distal interphalangeal joints, with some erosions of the proximal phalanx.  Dr. Cannella thought Plaintiff had seronegative rheumatoid arthritis.  R. 324.  A trial of prednisone had been prescribed to determine whether Plaintiff had seronegative rheumatoid arthritis, but Plaintiff did not respond as expected.  He was prescribed 7.5 mg of methotrexate (three pills weekly) and Celebrex.  *Id.*

On March 30, 2005, Plaintiff saw Dr. Cannella, who noted the methotrexate appeared to be working as there was less swelling of the finger joints even though the hands overall were still swollen, the fatigue was "a little better" and Plaintiff was better able to hold a trowel at work.  R. 319; *see* R. 18.  Upon examination, Dr. Cannella noted slight ulnar deviation, enlargement of the metacarpal joints without synovitis, synovitis on the third and fourth proximal interphalangeal joints, and some Heberden's nodules.  Strength remained 5/5 and symmetric.  His lower extremities, such as hips, knees, ankles, MTP's, PIP's, DIP's, had no synovitis, warmth, or erythema, and full range of motion was noted.  R. 320.  Plaintiff was still unable to make a claw or a fist and right shoulder movement remained painful.  His wrists, elbows, and shoulders were without any synovitis.  The assessment was "[s]eronegative RA."  Plaintiff's methotrexate dosage was increased to 12.5 mg (six pills) and Celebrex was continued.  Plaintiff did not respond to a prednisone trial so Dr. Cannella though "this is sero negative RA."

R. 320, 388.  In this report, Dr. Cannella noted that December 2004 x-rays were read by Daniel B. Yang, M.D., R, 335, and it was reported that the hip and SI joints were normal with mild degeneration from L4 through S1.  R. 320.[6]

On May 2, 2005, Dr. Cannella saw Plaintiff for continuing symptoms despite taking six methotrexate pills weekly, with no improvement in swelling and ongoing fatigue.  R. 316; *see* R. 18.  Upon examination of the upper extremities, Dr. Cannella again noted slight ulnar deviation, enlargement of the metacarpal joints without synovitis, trace synovitis on the third and fourth proximal interphalangeal joints, and some Heberden's nodules.  Right shoulder movement was painful with internal rotation and Plaintiff was unable to make a claw, but was able to make a fist unlike during previous visits.  His wrists, elbows, and shoulders were without any synovitis.  Examination results for his lower extremities remained the same.  The assessment was the same -- seronegative RA.  Examination also revealed Plaintiff's cranial nerves were grossly intact, strength was 5/5 and symmetric.  DTR's were +2-4 throughout and no sensory deficits were noted.  Dr. Cannella prescribed continuing methotrexate to reduce swelling and continuing Celebrex.  R. 317.  Dr. Cannella noted she was leaving town and Plaintiff would have to continue treatment through Dr. Serio or attempt to find a rheumatologist in town who would accept Medicaid.  R. 317-18.  This was Plaintiff's last

---

[6]  On April 26, 2005, Plaintiff reported to Frank E. Gredler, M.D., who presented with a non-exertional chest pain syndrome and a resting right bundle branch block pattern on EKG.  Dr. Gredler administered a Nuclear Stress examination and the results were normal.  R. 339-40; *see* R. 18, 21.  On January 17, 2008, Dr. Gredler administered a second nuclear stress with the following impressions: persistent inferobasal and inferolateral isotope attenuation felt consistent with artifact; preserved perfusion to the remaining left ventricular segments; and gated ejection fraction 57%.  R. 434; *see* R. 19. Dr. Gredler also administered a 2-D Echocardiogram with the following impressions: normal left ventricular size with normal systolic and diastolic function present; mild to modest degree of aortic valve sclerosis with no flow abnormality noted; and minimal degree of TR, RV/PA systolic normal calculated at 27 mmHg.  R. 432-33; *see* R. 19, 21.

visit with Dr. Cannella.  Plaintiff testified that he had not seen an arthritic specialist after being treated by Dr. Cannella.  R. 37-38.

At a June 13, 2005, follow-up with Dr. Serio, Plaintiff was taking up to five methotrexate pills, in addition to Celebrex.  R. 296.  He continued to have some synovitis in the hand joints with increased erythema and warmth.  Dr. Serio observed Plaintiff having some difficulty with ambulation and also getting up and out of a chair.  A course of prednisone was prescribed and taper with one refill.  *Id.*  As of October 31, 2005, Dr. Serio noted that Plaintiff was "pleasant, conversive in no apparent distress," although seen during this visit for a dog bite.  R. 205.  By December 12, 2005, Dr. Serio noted Plaintiff was "doing well" despite being unable to tolerate Celebrex and using only Aleve.  Dr. Serio noted some swelling in the hands, but instructed Plaintiff not to take methotrexate until the symptoms became bad again.  Regarding Plaintiff's extremities, Dr. Serio noted: "pulses are symmetrical and there is some swelling in the extremities of the hands.  There is full range of motion and grip strength is intact and symmetrical."  Dr. Serio also noted that Plaintiff's rheumatoid arthritis was treated with Aleve and he would "get back on Methotrexate when it is bad."  R. 294.

Plaintiff's next visit with Dr. Serio was on September 28, 2006, when Plaintiff informed Dr. Serio he was out of his arthritis medications, but was "working through the pain."  Plaintiff denied any neurologic complaints and he was in no apparent distress.  Examination of his extremities was normal.  R. 293, 351.  On October 2, 2006, Plaintiff was examined by Dr. Serio for his "multiple medical concerns and to combine this with his annual health maintenance and physical examination."  R. 292, 350.  He had an accident at home one to weeks prior and could not "extend his left thumb."  Examination

of his extremities was within normal limits and times 4 for range of motion, motor, sensory, deep tendon reflexes. His health maintenance examination was within normal limits. *Id.* On November 2, 2006, Dr. Serio "encouraged [Plaintiff] to get back on his medications" due to rheumatoid arthritis and a residual injury to the left thumb causing tendonitis. R. 291, 349. He also diagnosed early emphysema after reviewing chest x-rays. R. 333. After undergoing surgical intervention for a hernia in December 2006, on January 11, 2007, Plaintiff informed his hernia surgeon, Roy I. Schwartz, M.D., that he was ready to go back to work. R. 279, 284-86, 315, 379-81; *see* R. 18, 22.

On March 21, 2007, Plaintiff was treated by Dr. Serio for an infection of the middle right finger. Dr. Serio noted swelling of the joints in that digit. He was prescribed antibiotics and instructed to wait before restarting methotrexate. R. 290, 348.

On October 17, 2007, Plaintiff was examined by internist Victoria T. Te, M.D., at the Commissioner's request. R. 417-22; *see* R. 18-19. Plaintiff informed Dr. Te that he experienced swelling of joints and numbness, tingling, and pain in his hands related to rheumatoid arthritis, and was prescribed prednisone, Bextra, and five methotrexate (weekly) in addition to other medications. R. 421. Dr. Te noted no abnormalities and noted histories of rheumatoid arthritis, carpal tunnel syndrome, and hypertension, and shortness of breath of unknown etiology. R. 421-22. Plaintiff's range of motion in all joints and spine was normal. His gait was normal and he could walk on his toes and heels. Strength was 5+/5+ in the upper and lower extremities. Straight-leg raise was 90 degrees bilaterally, forward, and sideward bending of LS spine was normal. Handgrip was bilaterally normal. Fine and gross dexterity was normal. Neurological exam was normal. Dr. Te's impression was history of rheumatoid arthritis, history of

carpal tunnel syndrome, shortness of breath of unknown etiology, and history of hypertension.

R. 422.

On January 15, 2008, Plaintiff saw Dr. Serio for shortness of breath and was also continued on anti-inflammatory medications for his arthritis. Extremities were normal. Plaintiff continued on his medications. R. 441.

On March 20, 2008, Plaintiff filled out a questionnaire for Tallahassee Primary Care Associates and stated that he was unable to get a grip on things; had sharp pain in his hands when he pulls something; and his left pinkie finger does not straighten out completely. He reported strength in his legs, but walks with stiffness from his legs to the hill of his feet because he is in pain and unable to stand for longer periods of time. He can squat for a couple of minutes, but not walk on his toes and heels. He does not use an assistive device for ambulation. R. 465.

On March 24, 2008, non-examining physician David Guttman, M.D., opined that Plaintiff was capable of performing medium exertional activity without limitation.[7] R. 455-62; *see* R. 19. Dr. Guttman provided a narrative of the evidence that supported his conclusions. R. 456. In part, Dr. Guttman mentioned normal hand x-rays consistent with Dr. Lockwood's opinion, R. 336, but inconsistent with Dr. Cannella's interpretation, R. 324, 331. R. 456.

---

[7] Dr. Guttman's opinion was affirmed by a second non-examining state agency physician, Malin Weeratne, M.D., on December 30, 2008. Dr. Weeratne also noted negative x-rays of the hands. Dr. Weeratne also referred to Dr. Te's October 2007 examination ("completely normal musculo-skeletal exam, with normal muscle, and grip strength, with full ROM of joints"). R. 463. The opinion issued on October 24, 2007, was not a medical source, rather by a single decision maker (SDM), Social Security Administration employee, John Lott. R. 432-30; *see* R. 19.

On June 25, 2008, Plaintiff saw Dr. Serio reporting that he was tolerating his medications including weekly methotrexate, but had some flares of joint pain in the left shoulder and right elbow, exacerbated with work. Medications were continued and Dr. Serio noted that clinical testing indicated a possible left shoulder impingement and an MRI would be needed if there was no improvement. An injection for shoulder pain was provided. R. 467.

On February 24, 2009, Plaintiff saw Dr. Serio for ongoing myalgias and arthralgias in the neck and shoulder with occasional cramping and some swelling his joints. R. 466. Plaintiff was unable to work due to flare-ups. "He is on disability." *Id*. He reported some shortness of breath and wheezing. Only at the end of an exertional spell does he get a little short of breath. "He has been evaluated with PFT's and found to have no disease. He reports [sic] symptoms are not that bad." *Id*. An examination of Plaintiff's extremities revealed that pulses are symmetrical and there is no edema; some tenderness in the neck and shoulder area; no palpable spasm in the muscles or in the wrists, fingers, and hands. His assessment and plan included rheumatoid arthritis with positional polyarthralgias and a history of hypercholesterolemia. No shortness of breath and wheezing was noticed. Dr. Serio also noted that Plaintiff's hypertension numbers were pretty good when he takes his medication. Plaintiff was not taking prednisone or methotrexate, so these medications were renewed. *Id*.; *see* R. 19-20, 22.

On April 9, 2009, the first of two administrative hearings took place. R. 25-59. Plaintiff testified during this hearing and the ALJ expressed concern regarding several inconsistencies with information in the record regarding, for example, the amount he

was able to lift when working and his testimony. *See, e.g.,* R. 46-47.  Toward the end of

the first hearing the ALJ stated:

> ALJ: Well, I certainly want to give the claimant come opportunity to prove his
> case, but the records in here -- I think I can get some input from an internist with
> a subspecialty in rheumatology and tell us about what the records may and may
> not reflect, but there's some inconsistency if he can -- if his job only required him
> to lift 10 pounds or less, then I don't know that he wouldn't be able to return to
> that work.  Most of the evaluations of his upper and lower extremities are not
> showing anything significant but on the off chance that he may have some
> condition that most of the folks had missed in this record, I'll call somebody else
> to independently examine the file that can tell us about what the results and
> answer questions about rheumatoid arthritis and whether or not this file reflects
> that.  I don't see that from the normal signs and symptoms associate [sic] with
> rheumatoid arthritis, but it's possible that he may have a serum [sic] negative RA
> so we'll let an experienced doctor make the call and see what kind of functional
> limitations would be appropriate.  Bearing in mind that his -- he's not insured after
> June of '08.
>
> So I'll search around and see if I can find a rheumatologist in one of our
> regions that may be able to offer some input because I don't want to make that
> determination myself without getting medical input that would be able to interpret
> the test results that were in the record.

R. 53-54.

The hearing re-convened and on July 14, 2009, Robert S. Karsh, M.D., board

certified in internal medicine with a subspecialty in rheumatology, testified at the ALJ's

request during the supplemental hearing on the Plaintiff's claim.  R. 53-54, 57-58, 64,

163, 166; *see* R. 22.  Dr. Karsh explained that Plaintiff's pulmonary function in the

January 2008 tests showed "good pulmonary function" and that "I will not refer then to

his breathing complaints.  His major problem is rheumatoid arthritis."  R. 66.  Dr. Karsh

noted that "[h]is physicians are aware of his rheumatoid arthritis."  R. 67.  Regarding the

inflammatory arthritis, Dr. Karsh noted "whenever he's had any synovitis, that is swelling

in the joints, they have been relatively minor and they've involved only the fingers."

R. 67.  Addressing the negative rheumatoid factor testing, Dr. Karsh explained that "[s]eventy percent of patients with the disease do not have rheumatoid factor and they are said to be zero [sic] negative" as in the Plaintiff's case.  R. 68.  Dr. Karsh stated that the record did not support a claim that Plaintiff met a listing (arthritis).  R. 67-68.  Dr. Karsh then referenced the RFC opinion issued by the state agency non-examining physician (Exhibit 8F, Dr. Guttman, R. 455-62), finding there were "no real functional limitations noted" and Dr. Karsh agreed with the assessment.  R. 69.

Plaintiff's representative then requested clarification from Dr. Karsh regarding the diagnosis of rheumatoid arthritis with a negative rheumatoid factor.  Dr. Karsh explained, "[i]t's a marker.  It's not a cause of anything … it's very variable.  As a general rule, the people with a rheumatoid factor negative often have a milder disease than people who are rheumatoid factor positive.  For example, rheumatoid factor positives get a lot of puss cutaneous nodules around the joints, but there's not a [INAUDIBLE] factor negative."  R. 71.  Regarding the Plaintiff's medication dose of up to five methotrexate pills, Dr. Karsh explained the medication is given on a weekly basis, "that is a modest dose" (five pills) with ten pills given for individuals with more disease, but that "moderate is significant."  *Id*.  Dr. Karsh also explained that Plaintiff's treatment with prednisone was to address signs of inflammation, which may wax and wane with rheumatoid arthritis.  R. 72.  He noted that rheumatoid arthritis may lead to the loss of flexibility and suppleness of the affected joints.  R. 72.  Dr. Karsh was asked about Dr. Te's diagnosis of carpal tunnel syndrome and that there was no test or EMG performed to confirm the diagnosis and that Dr. Te "found no joint, muscle, or neurological abnormality."  R. 73.  Dr. Karsh's opinion was that the medical records

showed swelling of the metacarpal and proximal joints at times, but at other times they

were normal.  R. 76.  Dr. Karsh noted that Plaintiff was given other anti-inflammatories,

including Celebrex and Bactrim.  R. 74.

The ALJ summarized Dr. Karsh's testimony.

> Finally, Dr. Robert Karsh, M.D., a board certified internist with a sub-specialty rheumatology, testified as an impartial medical expert (ME).  Dr. Karsh testified that he did not know the claimant, had not provided professional services to him and he had thoroughly reviewed the claimant's medical record.  Dr. Karsh stated the record did not support that the claimant met a listed impairment.
> Dr. Karsh disagreed with the opinion of Dr. Cannella and her diagnosis of seronegative rheumatoid arthritis based on consistently normal SED (sedimentation) rate levels reflected in laboratory reports.  He stated that the record also failed to support a finding of carpal tunnel syndrome, as all reported diagnoses had been made "by history", without any supporting diagnostic testing or referral to [sic] for expert evaluation.  He said that the reports showed nothing more than tenderness of this claimant's right shoulder.
>
> . . . .
>
> Thus, Dr. Karsh stated that the records showed the claimant's hypertension was under control with his prescribed medication.  He noted that the claimant had mild degenerative disc disease of the lumbar spine from L4-S1.  Finally, Dr. Karsh stated that the medical evidence supported a conclusion that the claimant could perform medium work (Exhibits 5F [Dr. Te], 6F [Mr. Lott], 8F [Dr. Guttman]).

R. 22; *see* R. 23 ("In addition, Dr. Karsh . . . testified that it was his opinion that the RFC

evidence of record was an accurate reflection of the claimant's capacity at the time his

DLI lapsed.")

## C.  Plaintiff's Hearing Testimony

The ALJ summarized Plaintiff's hearing testimony.  R. 20-23.

> The claimant testified that he was currently 66-years old (he was 65 years of age at the time his DLI lapsed) and he has an 11th grade education [*see supra* n.3 (ninth grade education)].  He outlined his past relevant work as a stucco mason and plasterer for the Administrative Law Judge and vocational expert, as he had also done during the first hearing.  He stated that, after his injury, he returned to work as a plastering supervisor and had earned $7,800.  He said that he did not

do any lifting or carrying in performing this work.  He described the impairments that he alleged had caused him to become disabled.  He said that he had difficulty with using his hands, knees, balancing, shortness of breath, carpal tunnel difficulties, shoulder pain and hypertension.  However, in response to questioning from the Administrative Law Judge, he stated that, in recent years, he has only gone to the doctor about twice a year.  He said that he was capable of driving a motor vehicle for about 100 miles, but otherwise described a restricted range of activities of daily living.

. . . .

The claimant testified that his past relevant work included work as a supervisor of people doing plastering type work.  He stated that he did not perform the work himself while acting in that capacity.  He said that he had extensive experience doing plastering work in the years prior to becoming a supervisor.  He went on to state that his supervisory experience had come while he was self-employed and acting in the role of a sub-contractor on commercial and residential building projects.  His description of the work indicated that it was no more than light based on the lift/carry, sit/stand and work requirements.

. . . .

The undersigned finds that the claimant's testimony as to his very restricted range of activities of daily living is not credible in the face of the medical evidence when same as considered in its totality.  Thus, the undersigned concludes that the evidence shows that the claimant's impairments do not preclude medium exertion, consistent with his residual functional capacity

R. 20-22; R. 28-57 (first hearing), 77-92 (second hearing).  The ALJ concluded that

Plaintiff "was capable of performing his past relevant work as a construction supervisor,

plastering."  R. 23 (Finding 6) *see* R. 6 (AC Finding 5).  In making this finding, the ALJ

again referred to Plaintiff's testimony: "Finally, the claimant testified at the first hearing

that he did no more than light work based on the lift, carry, stand and walk requirements

of a plastering supervisor."  R. 23.

### D.  The ALJ's Decision

The ALJ issued a decision finding that Plaintiff was not disabled under the Social

Security Act.  R. 15-23.  The Appeals Council reopened the ALJ's decision and issued

the Commissioner's final decision, also finding Plaintiff not disabled.  R. 4-6.

At step one, the ALJ found that Plaintiff had not engaged in SGA after January 1,

2006, as modified by the Appeals Council, although he had work activity that did not rise

to the level of SGA.  R. 5 (AC), 17 (ALJ).

At step two, the ALJ found that Plaintiff's "degenerative disc disease from L4-S1;

arthritis of the right shoulder and hands and hypertension, controlled with medication"

were severe impairments.  R. 17.  The Appeals Council agreed.  R. 5.

At step three, the ALJ then found that none of Plaintiff's impairments either alone

or in combination met or equaled the criteria for a listed impairment in 20 C.F.R. Part

404, Subpart P, Appendix 1.  R. 20.  The ALJ found that Plaintiff had the RFC to

perform the "full range of medium work as defined in 20 C.F.R. § 1567(c)."[8]  R. 19.  The

Appeals Council agreed.  R. 5.  The ALJ found that Plaintiff's medically determinable

impairments "could reasonably be expected to cause some of the alleged symptoms";

however, Plaintiff's allegations of symptoms and limitations "are not credible to the

extent they are inconsistent with the above [RFC] assessment."  R. 21.

At step four, the ALJ found that Plaintiff could perform "his past relevant work as

a construction supervisor, plastering" as it was actually performed by Plaintiff.  R. 23.  In

making this determination, the ALJ expressly relied on the consultative examination

results of Dr. Te, the reports of two state agency consulting physician reports, and the

---

[8]  "Medium work involves lifting no more than 50 pounds at a time with frequent
lifting or carrying objects weighing up to 25 pounds.  If someone can do medium work,
we determine that he or she can also do sedentary and light work."  *Id.*; *see* R. 5.

testimony of Dr. Karsh.[9]  *Id.*  The ALJ also stated in part: "Finally, the claimant testified

at the first hearing that he did no more than light work based on the lift, carry, stand and

walk requirements of a plastering supervisor.  In comparing the claimant's [RFC] with

the physical and mental demands of this past relevant work, the undersigned finds that

the claimant was able to perform it as *actually performed* by this claimant based on his

earlier testimony."  R. 23 (emphasis added).  No alternate step five finding was made

regarding other jobs that Plaintiff could perform.  *Id.*

The Appeals Council granted Plaintiff's request for review of the ALJ's decision.

The Appeals Council re-issued the decision and affirmed the ALJ's findings, including

the ultimate finding that the RFC limitations "do not preclude the performance of past

relevant work as [a] construction supervisor, plastering."  R. 4-6.  The Appeals Council

noted, however, the proper date last insured was June 30, 2008, and the proper

amended alleged disability onset date was January 1, 2006, as different dates were

noted in the ALJ's decision.  R. 4-5.

### E.  Substantial evidence does not support the ALJ's determination at step four that Plaintiff can perform past relevant work as a construction supervising, plasterer as performed.

Plaintiff argues that the ALJ erred at step four when he found that Plaintiff could

perform past relevant work as a construction supervisor of plastering, having found at

step one that work Plaintiff performed *after* his alleged onset date as a construction

---

[9]  The reports were written by Dr. Guttman (Exhibit 8F, R. 455-62) and John Lott (Exhibit 6F, R. R. 423-30).  It does not appear that medical consultant, John Lott, is a physician.  *See* R. 430.

supervisor of plastering was not SGA. Doc. 11 at 9-10.[10] The Commissioner cites to

the evidence that supports the ALJ's determination that Plaintiff can perform his *past*

*work* as a construction supervisor, plastering, but does not discuss whether this work is

truly past relevant work as defined in the regulations. Doc. 12 at 9-10.

At the administrative hearing held on July 14, 2009, Plaintiff testified that after his

amended onset date of January 1, 2006, he returned to work as a plastering supervisor

for about four or five months and earned $7,800 (actually $7,856, R. 194, 203). R. 79;

*see* R. 31, 56-57 (April 9, 2009, hearing). He explained that "all [he] did is supervise.

[He] didn't work, [he] just supervised the job." R. 79. Plaintiff did not do any lifting or

carrying; he just observed and made sure the job was done properly. R. 80; *see* R. 20-

21 (Plaintiff's testimony regarding his supervisory work as plastering supervisor).

At step one, the ALJ found that Plaintiff worked after the alleged disability onset

date, "but this activity did not rise to the level of [SGA]." R. 17. Plaintiff states in his

memorandum that he "had performed some supervisory work previously, [although] his

prior work activity was mainly as a laborer," doc. 11 at 10 n.6, the latter fact not lost on

the ALJ, R. 20 (past relevant work as a stucco mason and plasterer); *see* R. 31-32, 56-

57, 79-81 (Plaintiff describing brief supervisory role in and around 2006 and prior to his

---

[10] "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing her past relevant work." Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 474 (6th Cir 2003). If the analysis reaches the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors." Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007); 20 C.F.R. § 404.1520(a)(4)(v) and (g).

amended alleged onset date).[11]

At step four, the ALJ concluded, and the Appeals Council agreed, that through Plaintiff's date last insured (June 30, 2008, as corrected), Plaintiff "was capable of performing his past relevant work as a construction supervisor, plastering. This work did not require the performance of work-related activities precluded by the claimant's credible" RFC, which the ALJ determined was Plaintiff's ability "to perform the full range of medium work." R. 5-6, 20, 23; *see supra* n.8 (definition of medium work). In support of his conclusion at step four, the ALJ stated:

> The examination of consultative examiner, Dr. Te, reflects that the claimant has no significant exertional limitations (Exhibit 5F). Two state consulting physicians also opined that the claimant retained the [RFC] for medium exertion (Exhibit 6F, 8F).[12] In addition, Dr. Karsh, a specialist in the field of rheumatology, testified that was his opinion that the RFC evidence of record was an accurate reflection of the claimant's capacity at the time [of] his DLI lapsed. Finally, the claimant testified at the first hearing that he did no more than light work based on the lift, carry, stand and walk requirements of a plastering supervisor.
>
> In comparing the claimant's [RFC] with the physical and mental demands of his past relevant work, the undersigned finds the claimant was able to perform *as actually performed* by this claimant based on his earlier hearing testimony.

R. 23 (emphasis added).

Plaintiff's impairment(s) "must prevent [him] from doing [his] past relevant work." 20 C.F.R. § 1520(f). One of three possible tests for determining whether or not a claimant retains the capacity to perform his or her past relevant work is "[w]hether the

---

[11] Plaintiff testified that all of his work history from approximately 1992-2006 was performed in the plastering trade. R. 82. The Commissioner refers to Plaintiff's statement in his memorandum that he performed some supervisory work prior to 2006. Doc. 12 at 9. It is fairly clear, however, that the ALJ relied on Plaintiff's testimony regarding his supervisory work performed *after* January 1, 2006, and not before. *See* R. 17, 20-23.

[12] *See supra* n.9.

claimant retains the capacity to perform the particular functional demands and job duties peculiar to an individual job as he or she actually performed it.  Under this test, where the evidence shows that a claimant retains the RFC to perform the functional demands and job duties of a particular past relevant job as he or she actually performed it, the claimant should be found to be 'not disabled.'"  Social Security Ruling (SSR) 82-61; *see* Barnhart v. Thomas, 540 U.S. 20, 25 (2003) (holding that claimant's previous work does not need to exist in significant numbers for claimant to be found not disabled at step four of sequential evaluation).

As noted above, the ALJ determined that Plaintiff's past work as a construction supervisor, plastering, did not require the performance of tasks precluded by Plaintiff's RFC.  R. 23.  In support of his finding, the ALJ explained that he compared Plaintiff's RFC with the physical and mental demands of that job and determined that Plaintiff could perform his past work as a construction supervisor, plasterer, as he actually performed it based on Plaintiff's hearing testimony.  *Id.*; *see generally* Brown v. Barnhart, 410 F. Supp. 2d 1287, 1300 (S.D. Fla. 2006).

Nevertheless, although the ALJ's finding at step four that he can perform the work described is supported by substantial evidence in the record, his step four determination that Plaintiff's work as a construction supervisor, plasterer is past relevant work does not comport with the requirements of 20 C.F.R. § 404.1560 (b)(1) that states: "(1)  Definition of past relevant work.  Past relevant work is work that you have done within the past 15 years, *that was substantial gainful activity*, and that lasted long enough for you to learn to do it.  (See 404.1656(a).)" (emphasis added).[13]  Claimants

---

[13]  Substantial gainful activity is work that involves significant mental and physical activities and is usually performed for pay or profit.  20 C.F.R. § 404.1572(a)-(b);

who can still do their past relevant work are not disabled.  Those who cannot do their

past relevant work proceed to the fifth step, in which the SSA determines whether

claimants, in light of their RFC, age, education, and work experience, can perform SGA

other than their past relevant work.  20 C.F.R. § 404.1560 (b)(1); 20 C.F.R. §

404.1520(a)(4)(v), (g)(1).  Claimants who can perform such work are not disabled.  *See*

*id.*; 20 C.F.R. § 404.1560 (c)(1).

On this record, because the ALJ determined that Plaintiff's past work as a

construction supervisor, plastering was not SGA at step one, he necessarily erred when

he determined at step four that such work was past relevant work.  *See generally*

Wright-Hines v. Comm'r of Soc. Sec., 597 F.3d 393, 397 (6th Cir. 2010 (White, J.,

concurring in part, dissenting in part) ("no evidence that her work as a cashier met the

regulatory criteria to be considered substantial gainful activity").  On remand, the ALJ

should re-evaluate the evidence at steps one and four and proceed to consider the

evidence, including consulting a vocational expert, if necessary, for a step five analysis.

**V. Conclusion**

Considering the Record as a whole, the ALJ erred when he determined at step

four that Plaintiff could perform past relevant work as a construction supervisor,

plastering, when the ALJ had also determined that this type of work was not substantial

gainful activity at step one.  As a result, the ALJ's determination is not supported by

substantial evidence and he did not correctly apply the law.  Accordingly, pursuant to

the fourth sentence in 42 U.S.C § 405(g), it is respectfully recommended that the

---

Johnson v. Sullivan, 929 F.2d 596, 597 (11th Cir. 1991).  Substantial gainful activity only
bars entitlement to benefits during periods of employment.  Powell ex rel. Powell v.
Heckler, 773 F.2d 1572, 1576 (11th Cir. 1985).  Relevant here, this means that
Plaintiff's work after January 1, 2006, would not bar his request for DIB because this
work was *not* SGA.

decision of the Commissioner to deny Plaintiff's application for Social Security DIB be

**REVERSED** and this case **REMANDED** for further proceedings.

IN CHAMBERS at Tallahassee, Florida, on December 3, 2013.

s/ Charles A. Stampelos
CHARLES A. STAMPELOS
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**